# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES *EX REL*
MARCUS FEASTER,

and

MARCUS FEASTER, Individually,

      *Plaintiffs,*

  vs.                           Case No. 13-1453-EFM-KGG

DOPPS CHIROPRACTIC CLINIC, LLC

and

JOHN DOPPS,

      *Defendants.*

## MEMORANDUM AND ORDER

Plaintiff Marcus Feaster brings this lawsuit to rectify wrongs that he allegedly observed and suffered while employed by Dopps Chiropractic Clinic, LLC, and John Dopps ("Defendants"). In Count I, Feaster alleges that Defendants used fraudulent billing schemes to earn unjustified Medicare reimbursements in violation of the False Claims Act ("FCA"). In Count II, Feaster alleges that Defendants also created a hostile work environment demeaning to minority race, religion, ethnicity, and gender groups in violation of § 1981, Title VII, and the Kansas Act Against Discrimination ("KAAD"). In Count III, Feaster finally alleges that he

opposed Defendants' fraud and bigotry and, consequently, Defendants fired him in violation of the FCA, §1981, Title VII, KAAD, and Kansas common law. Defendants now jointly seek dismissal of each of Feaster's claims or partial summary judgment. Feaster, alternatively, requests a hearing to argue Defendants' motion. The Court finds, however, that a hearing is unnecessary and rules on the record before it. The Court denies Feaster's motion for oral arguments and, for the reasons discussed below, grants in part and denies in part Defendants' motion.

## I.      Factual Allegations[1]

Defendant Dopps Chiropractic Clinic, LLC ("the Clinic"), with closely related chiropractic clinics, operates one of the region's largest chiropractic care providers. Individual Defendant and chiropractic physician John Dopps ("Dopps") owns and operates the Clinic. From February 14, 2012, until July 8, 2013, Defendants employed Plaintiff Feaster, a licensed chiropractor, to "shadow" Dopps and assist him with his practice.

Defendants' practice involves treating Medicare Part B beneficiaries. Medicare is a federally-funded insurance program that provides health benefits to elderly and disabled individuals. The Department of Health and Human Services, Centers for Medicine and Medicaid Services ("CMS") administers the Medicare program. CMS publishes an advisory Medicare Benefits Policy Manual ("Manual") that describes covered services and claims procedure. Medicare Part B reimburses qualified physicians for certain healthcare services. Most relevant, Medicare reimburses qualified chiropractors for manual manipulation of the spine to correct a subluxation that has resulted in a neuromusculoskeletal condition for which manual manipulation

---

[1] The following allegations come from the facts set forth in Feaster's Amended Complaint (Doc. 10).

constitutes appropriate treatment.  Such covered treatment is designated "active therapy" on Medicare reimbursement forms.  But Medicare does not cover X-rays or other diagnostic or therapeutic services furnished or ordered by a chiropractor.  Such uncovered treatment is designated "maintenance therapy" on reimbursement forms.  The Manual also requires certain documentation connected to demonstrating subluxation.

While performing his responsibilities as Defendants' employee, Feaster claims he routinely observed Defendants improperly billing Medicare for unperformed, uncovered, unnecessary, or undocumented treatment.  Feaster describes the following practices as common. First, Dopps would provide patients a manipulation of the spine in one region (e.g. the patient's neck) but would bill or instruct others to bill Medicare for manipulation to additional untreated areas (e.g. the patient's neck, upper back, and lower back).  Second, Defendants would provide uncovered maintenance therapy to patients and then claim reimbursement for those services by misrepresenting them as active corrective therapy.  Third, Dopps often performed active therapy without a basis for such treatment.  Specifically, Dopps would treat patients for subluxation without any examination or after coaching the patient falsely to report symptoms consistent with subluxation.  Finally, Defendants often failed to record patients' history, diagnosis, prognosis, or treatment goals.  And if a patient or insurer petitioned for the records, Defendants would "recreate" the desired information.  In each instance, Feaster claims that Defendants billed Medicare knowing that the actual circumstances did not justify payment.  Feaster also explains that he often received no notice that Medicare rejected Defendants improper claims.

Also during his employment, Feaster routinely observed Dopps engaged in conduct that disparaged others' race, sex, religion, and national origin.  Dopps' offensive behavior included: telling "N-word jokes;" referring to President Barack Obama as "that [N-word] in office;"

speculating on others' sex lives and discussing their appearance; viewing pornography in view of other employees; stating that bad deals "Jewed" him and otherwise belittling Jewish people; performing condescending impersonations of Asians and Muslims; and directing immigration-status jokes and other demeaning remarks at Mexicans.  Feaster claims that these and other comments highly offended him and many of his coworkers.

Once Feaster became aware of Defendants' billing practices and Dopps' bigotry, Feaster confronted Dopps.  More than once, Feaster conveyed to Dopps his belief that Defendants' billing amounted to fraud.   On one occasion, Feaster tried to correct the improper billing and provoked Dopps to remark: "we'll never get caught" and "we'll be able to fix the billing if anyone asks."  On another occasion when confronted with Feaster's objection, Dopps warned Feaster: "you should come to terms with what we do here or find another place to work."  Nearly every week of his employment until six weeks before his last day of work, Feaster also complained to Dopps about Dopps' discriminatory and offensive workplace behavior.

Around July 2013, Dopps constructively terminated Feaster as punishment.  Originally, Feaster's employment agreement compensated him with a base salary of $2,000 per month, plus an additional 50% of the revenue from business that he generated.  But Dopps unilaterally altered that agreement.  Dopps announced that Feaster would no longer be a salaried employee.  Rather, Dopps would consider Feaster an independent contractor, and Feaster would receive $10 for each existing patient and $25 for each new patient that Feaster treated.  Feaster stopped working one week after Dopps' proposal.

## II.      Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[2] Upon such motion, the Court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.' "[3]   A claim is facially plausible if the plaintiff pleads facts sufficient for the Court to reasonably infer that the defendant is liable for the alleged misconduct.[4]   The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[5]   Under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[6]   Viewing the complaint in this manner, the Court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[7]   If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.' "[8]

---

[2] Fed. R. Civ. P. 12(b)(6).

[3] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[5] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[6] *Iqbal*, 556 U.S. at 678–79.

[7] *See id.* at 678. ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citing *Twombly*, 550 U.S. at 556)).

[8] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

### III.    Analysis

As a preliminary matter, the Court considers Defendants' early partial motion for summary judgment.  Summary judgment is appropriate only if the moving party demonstrates that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.[9]  The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[10]

Defendants first ask the Court to grant judgment favor of the Clinic on Count I because the Clinic is ineligible to participate in the Medicare program.  Feaster concedes this fact but not the Clinic's wholesale immunity from FCA liability.  Defendants fail to provide any authority for the proposition that only Medicare participants can violate the FCA.  Indeed, the Clinic need not be a licensed chiropractor to violate the FCA.[11]  Even accepting that the Clinic is ineligible to participate in the Medicare program, therefore, Defendants fail to prove that the law entitles them to summary judgment.

Defendants also ask the Court to grant judgment in their favor under Counts II and III because neither defendant allegedly employed Feaster.  Defendants present evidence suggesting that a separate professional association solely owned by Dopps, John Dopps Chiropractor, P.A. ("Dopps P.A."), employed Feaster.  Conversely, Feaster insists that the Clinic and its agent, Dopps, employed him.  Importantly, only Title VII, KAAD, and Kansas common law limit

---

[9] Fed. R. Civ. P. 56(a).

[10] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[11] For example, even if the Clinic technically cannot make a claim under Medicare the FCA imposes liability on entities who knowingly take actions that *cause* the presentment of false claims.  *See United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714–15 (10th Cir. 2006).  At least two circuits also accept vicarious liability for FCA violations.  *See Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983); *United States v. O'Connell*, 890 F.2d 563, 567–68 (1st Cir. 1989).

recovery to a technical "employer."[12]   And for reasons discussed below, Feaster's retaliation claim under Kansas common law fails for a more fundamental legal defect.

Thus, the Court need only address the existence of an employer-employee relationship under Title VII and KAAD.  Title VII's employer-employee relationship tests apply to claims under KAAD.[13]  The Tenth Circuit uses three different Title VII employer-employee relationship tests, each test designed for particular circumstances.[14]  The parties only dispute the application of the single-employer test.  The single-employer test enables a "plaintiff who is the employee of one entity . . . to hold another entity liable by arguing that the two entities effectively constitute a single employer."[15]  Courts generally consider four factors to determine the degree of unity between two entities: (1) interrelations of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control.[16]  Presumably, Feaster endorses the applicability of this test to argue that the Clinic and Dopps P.A., both under Dopps' ownership, effectively amount to a single employer.

The resolution of this issue is fact-intensive and the evidence before the Court is minimal. While Rule 56(b) permits the filing of early summary judgment motions, Defendants' filed this

---

[12] The FCA's retaliation provision protects "[a]ny employee, contractor, or agent."  31 U.S.C. 3730(h)(1). This language replaced the term "employee" to broaden "protection to persons in employment-like relationships that were not technically 'employees.' "  *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014) (citations omitted).   Similarly, § 1981 authorizes recovery from wrongdoers other than plaintiff's technical employer.  *See Flores v. City and Cty. of Denver*, 30 F. App'x 816, 819 (10th Cir. 2002) (emphasizing that § 1981 liability requires "an underlying employment contract" and that "the individual defendant was personally involved in the discriminatory conduct" affecting plaintiff's employment contract).  Defendants do not refute specifically that these principles theoretically subject them to liability for Feaster's claims.

[13] *Nixon v. Nw. Mut. Life Ins. Co.*, 58 F. Supp. 2d 1269, 1274 n.2 (D. Kan. 1999).

[14] *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225–27 (10th Cir. 2014).

[15] *Bristol v. Bd. of Cty. Comm'rs*, 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc).

[16] *Knitter*, 758 F.3d at 1227(quotation omitted).

motion as a responsive pleading before the parties engaged in any formal discovery.  What little evidence the parties offer indicates a genuine factual dispute concerning the single-employer test factors.  Still, "[s]uch a dispositive motion is premature[;] . . . the court is in no position to make a determination that defendant . . . is entitled to judgment as a matter of law."[17]   The Court therefore provisionally denies summary judgment.  Following any discovery, Defendants may again challenge the existence of an employer-employee relationship under Title VII and KAAD.

Next, the Court considers Defendants' arguments for dismissal of Feasters' three counts.

## A. Count I—False Claims Act

The FCA "covers all fraudulent attempts to cause the government to pay out sums of money."[18]   The FCA also authorizes private individuals to sue on the government's behalf.[19] Feaster's amended complaint refers to four schemes of allegedly fraudulent conduct that violate two subsections of the FCA.  Those two subsections create liability for any person who

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.[20]

Feaster's amended complaint fails to explain which subsection(s) each particular scheme violates.  But Defendants seek dismissal of Feaster's FCA count because it omits other particular

---

[17] *Bailey v. West*, 1996 WL 46040, at *2 (D. Kan. Jan. 26, 1996).

[18] *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotations omitted).

[19] 31 U.S.C. § 3730(b).

[20] 31 U.S.C. § 3729(a)(1)(A)–(B).  Feaster's Amended Complaint claims violations of § 3729(a) and (b)— the organization that existed prior to a May 2009 amendment.  The May 2009 amendment reordered § 3729. Subsection (a)(1) became (a)(1)(A).  Subsection (a)(2) became (a)(1)(B).  Feaster alleges violations of the FCA that occurred after the 2009 amendment.  Accordingly, the Court uses the post-amendment version of § 3729.

details. Specifically, Defendants primarily argue that Feaster's amended complaint fails to plead particular facts supporting the allegations of fraud. Even more specifically, Defendants fault the amended complaint for omitting facts associating the alleged fraud with a particular instance of a knowing false claim submission.

FCA violations involve "circumstances constituting fraud or mistake" that must be pled with particularity under Rule 9(b).[21] Generally, "Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud."[22] This means that a plaintiff's allegations must identify the time, place, content, and consequences of the fraudulent conduct.[23] Consistent with pleading these details, a FCA relator "need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme."[24]

Feaster emphasizes the following details from his amended complaint as adequate to describe the "who, what, when, where and how" of the alleged Medicare fraud. Regarding the *who*, Feaster explains that Dopps and the Clinic conspired with an office manager identified as "A.D." to defraud the government. Regarding the *what*, Feaster describes the four schemes (outlined above) whereby Defendants allegedly billed the government for unperformed, uncovered, unnecessary, or undocumented treatment. Regarding the *when*, Feaster recalls these schemes as commonplace during his employment with Defendants, from February 14, 2012, until July 8, 2013. Regarding the *where*, Feaster identifies Defendants' chiropractic clinic

---

[21] Fed. R. Civ. P. 9(b); *see also Sikkenga*, 472 F.3d at 727.

[22] *Sikkenga*, 472 F.3d at 727.

[23] *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171 (10th Cir. 2010).

[24] *Id.* at 1172.

located in Wichita, Kansas. Finally, regarding the *how*, Feaster repeats that he observed Defendants submit fraudulent claims for payment, that on many occasions he received no notice that the government rejected those claims, and that Dopps cavalierly disregarded his complaints.

Notwithstanding these allegations, Feaster fails to plead adequately particular facts to satisfy Rule 9(b). "Liability under the FCA requires a false claim."[25] Rule 9(b) requires details that identify particular false claims for payment that were submitted to the government.[26] Though no checklist of mandatory details exists, the Tenth Circuit approves

> details concerning the dates of the claims, the content of the forms or the bills submitted, their identification numbers, the amount of money charged to the government, the particular goods and services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices [as representative of] the types of information that may help a relator to state his or her claims with particularity.[27]

A plaintiff who omits these details "alleges at best the existence of a general scheme or methodology by which defendants could have violated the False Claims Act. That is simply insufficient under Rule 9(b)."[28]

Missing from Feaster's account of the "who, what, when, where and how" of Defendants' alleged fraud are details that link the four possible fraudulent schemes to particular false claims for payment. Essentially, Feaster avers details of underlying misconduct and generally alleges

---

[25] *Sikkenga*, 472 F.3d at 727.

[26] *Id.* at 727–28 (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232–33 (1st Cir. 2004)) ("unless . . . pleadings are 'linked to allegations, stated with particularity, of the actual false claims submitted to the government,' they do not meet the particularity requirements of Rule 9(b).").

[27] *Id.* (quoting *Karvelas*, 360 F.3d at 232–33); *see also United States ex rel. Lacy v. New Horizons, Inc.*, 348 F. App'x 421, 425 (10th Cir. 2009).

[28] *United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*, 2000 WL 1595976, at *6 (10th Cir. 2000) (unpublished table decision).

that billing and payment occurred based on that conduct.[29]   But the amended complaint omits any details that connect those underlying schemes of fraud to facts that pinpoint a specific falsity associated with a particular claim for payment.   Nowhere in the amended complaint does Feaster identify a specific amount that Defendants fraudulently billed and that the government unwittingly paid.   Nowhere in the amended complaint does Feaster identify the date that Defendants submitted an allegedly false claim, the date that the government paid an allegedly false claim, or the date that Defendants provided the underlying treatment associated with a false claim.   Nowhere in the amended complaint does Feaster identify—whether by name, initials, identification number, date of service, or any other means—a particular patient whose treatment resulted in false claims for payment.   Nowhere in the amended complaint does Feaster identify a representative or specific claims form, billing invoice, or medical record used by Defendants to submit a false claim.   This last omission is particularly difficult to overlook considering the information's importance to understanding exactly how Defendants misrepresented their services to the government.[30]   Feaster need not have included all of these details.   But without any one of these details, the amended complaint merely relates the unspecific narrative of four fraudulent schemes.   Defendants theoretically could have employed the alleged schemes to submit or cause the presentment of false claims to the government.[31]   But Feaster does not plead adequately

---

[29] For example, paragraph 72 reads: "For instance, Defendant would provide a treatment only to patient's neck but bill Medicare for treatment to the patient's neck, upper back, and lower back."

[30] *See Lacy*, 348 F. App'x at 426 (considering plaintiff's complaint insufficient to meet Rule 9(b) because the complaint "neither explain[ed] nor provide[d] any specific examples to demonstrate what exactly was altered or misstated on [billing] forms.").   If Feaster altered nothing else in the amended complaint, adding this information would also help to identify which FCA provision(s) each particular scheme violated and whether those schemes involved a factual falsity, express false certification, or implied false certification.   *See Conner*, 543 F.3d at 1217–18.

[31] In reconsidering his pleadings and any alleged FCA liability based on "causing" the presentment of a false claim, the Court urges Feaster closely to consider the need to identify "specific actions taken by [defendant];"

particular details to vivify that speculative possibility as required by Rule 9(b).  Accepting the possibility that Feaster can cure these defects by adding more particular details to the amended complaint, the Court grants Feaster leave to amend his pleadings and denies Defendant's motion to dismiss Count I.   However, upon failure to timely or adequately amend the pleadings, Defendants may renew their motion to dismiss.

## B. Count II—Hostile Work Environment

Feaster's next count alleges that Dopps frequently polluted the work environment with comments and behavior offensive to Asians, African Americans, Mexicans, Jewish and Muslim people, and women.   Feaster claims that this conduct created a hostile work environment unlawful under § 1981, Title VII, and KAAD.[32]   Defendants respond that Feaster alleges a nonactionable third-party injury.   Although Feaster makes no representation to the Court regarding his personal characteristics which might place him within a protected class, Defendants represent to the Court that Feaster is a Caucasian male who lacks the protected characteristics targeted by Dopps alleged bigotry.   Defendants cite several nonbinding cases for the general proposition that an individual cannot recover for alleged discriminatory acts directed at others.[33]   Defendants also point out that Feaster fails to plead adequate details to show that Defendants qualify as an "employer" under Title VII or KAAD.   While Feaster includes a

---

"[a] bald assertion that a defendant has caused a false claim to be presented would plainly fail to state a claim for relief."  *Sikkenga*, 472 F.3d at 715 n.17.

[32] Feaster claims that Defendants conduct created a hostile work environment unlawful under 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.*; and the Kansas Act Against Discrimination, Kan. Stat. Ann. § 44-1001 *et seq.*  These statutes create identical standards and burdens.  *See, e.g.*, *Harris v. Cmty. Res. Counsel of Shawnee Cty., Kan., Inc.*, 2006 WL 1360080, at *8 (D. Kan. May 16, 2006) (citing state and federal cases equating prima facie cases for § 1981, Title VII, and KAAD claims).  Thus, this Order applies Title VII, § 1981, and KAAD authority without distinction.

[33] *See Lyman v. Nabil's Inc.*, 903 F. Supp. 1443, 1446–47 (D. Kan. 1995); *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 186 (2nd Cir. 2001); *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179–81 (7th Cir. 1998).

number of legal rules in his reply and a restatement of his pleadings, his reply lacks the relevance or analysis necessary to usefully address Defendants' arguments and Count II's adequacy.

Defendants' factual representation about Feasters' race and gender aside, Feaster's amended complaint fails to plead a viable hostile work environment claim. Title VII and KAAD limit liability to employers who employ a sufficient minimum number of workers.[34] Even then, liability for a hostile work environment depends on proving four elements: "(1) the plaintiff is a member of a protected group; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment was based on the plaintiff's protected characteristic; and (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of the plaintiff's employment and created an abusive working environment."[35] Nowhere in the amended complaint does Feaster plead facts to show Defendants' status as an "employer" or support the first three prima facie elements. Feaster does not allege the number of workers employed by Defendants during his own employment. Feaster does not allege that he belongs to any protected class. He does not allege any characteristics that would allow the Court to place him within any protected class. He does not allege that Defendants directed any of the representative discriminatory actions at him. He also fails to allege that Defendants undertook harassing behavior based on his own characteristics. Considering these omissions, Feaster fails to present a plausible hostile work environment claim.

---

[34] *See* 42 U.S.C. § 2000e(b) (defining "employer" under Title VII as one with 15 or more employees); K.S.A. § 44-1002(b) (defining "employer" under KAAD as one with 4 or more employees).

[35] *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262–63 (10th Cir. 2005).

It may also be that Feaster lacks standing for this claim under Title VII and possibly KAAD.[36]  The parties do not direct the Court to any Tenth Circuit authority that addresses a plaintiff's prudential standing to challenge discrimination directed at others who possess protected characteristics not shared by the plaintiff.  On at least three occasions, however, this Court has considered the issue.  On two of those occasions, a white employee asserted a Title VII claim for a work environment hostile to black employees.[37]  On the remaining occasion, a male employee asserted a Title VII claim for a work environment hostile to female employees.[38]  In each case, the Court concluded that the plaintiff failed to qualify as a "person aggrieved" under Title VII and thus lacked standing to redress discrimination directed at individuals outside the plaintiff's class.[39]  Title VII confers standing to sue on "the person claiming to be aggrieved."[40]  These cases essentially read Title VII's prohibition against "unlawful employment practices" to mean that only plaintiffs discriminated against "*because of their* race, color, religion, sex, or national origin" can be aggrieved.[41]  Accordingly, these cases reason that an employer who creates a work environment hostile to a protected group does not thereby alter the conditions of a

---

[36] Though courts regularly consider the same prima facie elements to decide claims under Title VII and KAAD, deciding standing under their slightly varied statutory language is another matter and entirely unaddressed by Kansas courts.  KAAD, however, defines "unlawful employment practice" nearly exactly as Title VII.  *Compare* K.S.A. §§ 44-1002(g) and -1009(a) *with* 42 U.S.C. § 2000e(a).  Title VII prudential standing often depends on federal courts' interpretation of this language.  Given Kansas courts' general desire to read KAAD consistent with Title VII, the similarity of language material to evaluating Title VII standing *may* support applying Title VII's standing analysis to KAAD.

[37] *See Moore v. Total Sleep Diagnostics of Kan., Inc.*, 2001 WL 789231 (D. Kan. June 29, 2001); *Jones v. City of Overland Park*, 1994 WL 583153 (D. Kan. Aug. 15, 1994).

[38] *Lyman*, 903 F. Supp. 1443.

[39] *See id.* at 1447–48; *Moore*, 2001 WL 789231, at *2; .*Jones*, 1994 WL 583153, at *3.

[40] 42 U.S.C. § 2000e-5(f)(1).

[41] *Jones*, 1994 WL 583153, at *3; *see also Moore*, 2001 WL 789231, at *2 (endorsing *Jones*); *Lyman*, 903 F. Supp. at 1447 ("[Title VII] generally defines unlawful employment practices as actions taken against an individual employee due to that employee's race, color, religion, sex, or national origin.").

non-protected plaintiff's employment because of that plaintiff's characteristics.[42]   Similarly, §

1981 appears to limit standing to assert a hostile work environment claim only to plaintiffs

within the group that is the focus of the employer's hostility.[43]   Importantly, the amended

complaint lacks a factual basis for the Court to apply these (or alternative) rules.[44]

Because Count II contains inadequate allegations to show this Court is entitled to grant

him the relief that he seeks, the Court grants Defendants' motion to dismiss Feaster's hostile

work environment claim.

## C. Count III—Wrongful Termination[45]

Feaster's final count alleges that Defendants effectively compelled his discharge as

retribution for opposing their fraudulent and discriminatory practices.   Specifically, Feaster

claims that the unilateral modification of his salary amounts to retaliation under the FCA, §

1981, Title VII, KAAD, and Kansas common law.   Defendants object to the adequacy of

Feaster's retaliation claims for the more specific reasons discussed below.

### 1. False Claims Act Whistleblower Retaliation

The FCA complements its anti-fraud objective by protecting employees who act to

oppose fraud against the government.   The FCA currently protects as a whistleblower

---

[42] *See Moore*, 2001 WL 789231, at *2; *Lyman*, 903 F. Supp. at 1448; .*Jones*, 1994 WL 583153, at *3.

[43] *See Blanks v. Lockheed Martin Corp.*, 568 F. Supp. 2d 740, 743–47 (S.D. Miss. 2007); *Longoria v. New Jersey*, 168 F. Supp. 2d 308, 318 (D.N.J. 2001); *Santiago v. Giant Food, Inc.*, 2001 WL 118628, at *6–7 (D. Md. Feb. 5, 2001).

[44] Alternatively, for example, the Court is aware of extra-Tenth Circuit authority that finds standing where a nonminority plaintiff alleges that work environment hostile to minorities deprived plaintiff of important benefits from interracial association.   *See Clayton v. White Hall Sch. Dist.*, 875 F.2d 676, 679–80 (8th Cir. 1989).   But Feaster does not plead facts showing the loss of association with racial minorities.

[45] The Court notes that Feaster titles Count III as a "Constructive or Actual Wrongful Termination" claim, but his allegations (and the parties' briefing) regard retaliatory discharge.   Accordingly, the Court will consider whether the amended complaint states a plausible retaliation claim under the FCA, § 1981, Title VII, KAAD, and Kansas common law.

> [a]ny employee . . . [that] is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA].[46]

A plaintiff seeking whistleblower protection must plausibly allege facts showing that: (1) the employee engaged in protected activity; (2) the employer received notice of the employee's protected activity; and (3) the employer discriminated against or discharged the employee for engaging in protected activity.[47]  Defendants challenge only the first two elements.

Initially, Defendants dispute that the amended complaint contains any plausible allegation of protected activity. Quoting the outdated § 3730(h), Defendants argue that Feaster fails to allege conduct "in furtherance of an action under [the FCA], including investigation for . . . or assistance in an action filed under this section."  Feaster, however, need no longer allege such conduct to adequately plead protected activity.  Defendants' argument relies on the prior version of § 3730(h).  In 2009, the current version of § 3730(h) took effect and replaced the version relied on by Defendants.[48]  The current version "represents a significant expansion of protection"[49] by embracing "other efforts to stop 1 or more violations of [the FCA]."[50]

---

[46] 31 U.S.C. § 3730(h)(1).  Formerly, the FCA whistleblower provision protected a more narrow swath of whistleblowing activity—only "acts done . . . in furtherance of an action under this section, including investigation for,  initiation of, testimony for, or assistance in an action filed or to be filed under this section."  31 U.S.C. § 3730(h) (2006).  The Tenth Circuit has yet to address directly the effect of this new language on its jurisprudence.

[47] *See McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d  698, 703–04 (10th Cir. 2012) (discussing FCA retaliation claim requirements without distinguishing between former and current version of § 3730(h)); *Sikkenga*, 472 F.3d at 729 (discussing FCA retaliation claim requirements under former version of § 3730(h)); *United States ex rel. New Mexico v. Deming Hosp. Corp.*, 992 F. Supp. 2d 1137, 1163 (D.N.M. 2013) (discussing FCA retaliation claim elements based on current version of § 3730(h)).

[48] *See* Pub. L. No. 111-21, § 4(f), 131 Stat. 1617 (2009).

[49] *Deming*, 992 F. Supp. 2d at 1163.

[50] 31 U.S.C. § 3730(h).

Accordingly, protected activity now includes any formal action under the FCA *or* other efforts to prevent fraud on the government.[51]   An employee need not actually file a qui tam action to undertake conduct deserving of whistleblower protection.[52]   Considering Feaster's repeated allegations that he "reported to Dr. Dopps," "repeatedly opposed," and "attempted to remedy" fraudulent schemes for billing the government, the amended complaint plausible pleads protected activity.

Defendants also read the amended complaint as lacking any allegation that demonstrates their awareness of Feaster's protected activity.  Defendants characterize Feaster's allegations at best to state a mere concern for "the propriety of charges."  Their only authority for this argument, however, distinguishes "the employee [who] merely questioned [the] propriety of charges to the Government" from "the employee [who] told the employer she was concerned about the company defrauding the Government."[53]   While the second category of employees "express[ed] concerns about possible fraud to their employers," the first category employee "never used the terms 'illegal,' 'unlawful,' or '*qui tam* action' in characterizing his concerns."[54] Feaster expressed his concern that Defendants used "unethical, illegal, and fraudulent billing practices for Medicare and private insurance."  The Court simply cannot overlook, as Defendants do, that this allegation and others in the amended complaint place Feaster among the second category of employees and not among those who merely questioned the propriety of the defendant's billing activities.

---

[51] 31 U.S.C. § 3730(h); *Deming*, 992 F. Supp. 2d at 1164.

[52] *McBride*, 688 F.3d  at 704.

[53] *United States ex rel. Smith v. The Boeing Co.*, 2006 WL 542851, at *8 (D. Kan. Feb. 27, 2006) (citing *Robertson v. Bell Helicopter Textron Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)).

[54] *Robertson*, 32 F.3d at 951.

Similarly, Defendants characterize Feaster's allegations as "mere warnings of regulatory noncompliance and false reporting" that fail to constitute notice.  However persuasive the Court might have deemed Defendants' Third Circuit authority,[55] the Court deems that authority even less persuasive considering the intervening amendment to § 3730(h).   That amendment broadened the scope of protected activity, which accordingly broadened the scope of acts creating notice of protected activity.  What the old law considered adequate to provide notice of "acts done . . . in furtherance of an action under [the FCA]"[56] has little bearing on what the new law considers adequate to provide notice of "efforts to stop 1 or more violations of the FCA."[57] In other words, what constituted notice of activity protected under § 3730(h)'s prior version no longer precisely controls what constitutes notice of activity newly protected under the current § 3730(h).[58]  Notice of the second sort exists if the employee's actions—including warnings of regulatory noncompliance and false reporting—suggest to the employer that the employee was seeking specifically to prevent fraud on the government.[59]  Feaster pleads that he "reported to Dr. Dopps that his billing practices were unethical if not fraudulent."  He also pleads that one particular attempt to remedy the improper billing practices provoked Dopps to remark: "we'll never get caught" and "we'll be able to fix the billing if anyone asks."  These and other

---

[55] *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 188 (3d Cir. 2001).

[56] 31 U.S.C. § 3730(h) (2006).

[57] 31 U.S.C. § 3730(h).

[58] *See Deming*, 992 F. Supp. 2d at 1163–64.  Interestingly enough, Defendants' Third Circuit authority also reasons that the kind of conduct adequate to give an employer notice of protected activity necessarily depends on the type of activity that the FCA protects.  *Hutchins*, 253 F.3d at 188 ("Courts have recognized 'the kind of knowledge the [employer] must have mirrors the kind of activity in which the [employee] must be engaged.")

[59] *Deming*, 992 F. Supp. 2d at 1165.

allegations satisfy Feaster's burden to plead facts showing that Defendants knew of Fester's protected activity.

Though Defendants do not argue the third element, the Court will consider it before approving Feaster's FCA retaliation claim.  Again, the third element requires Feaster to allege facts showing that Defendants discriminated against or discharged him for engaging in protected activity.  Regarding the simple fact of discrimination, Feaster alleges that Defendants unilaterally revoked his status as an employee, designated him an independent contractor, and declared a less favorable method for determining his compensation.  Regarding the motive for these changes, Feaster alleges that Defendants altered his employment conditions to punish him for opposing Defendant's billing practices.  Feaster also alleges that Dopps once warned him: "you should come to terms with what we do here or find another place to work."  With these allegations, Feaster plausibly pleads all required elements of retaliation under the FCA's § 3730(h). Accordingly, the Court denies Defendants' motion to dismiss Feaster's FCA retaliation claim under Count III.

## 2. Section 1981, Title VII, and KAAD Retaliation

Feaster also alleges that Defendants unlawfully punished him for opposing discrimination prohibited under § 1981, Title VII, and KAAD.  Again, these laws involve the same prima facie elements.[60]  Relief under these laws requires Feaster plausibly to allege that: (1) he engaged in protected activity; (2) Defendants took action against him that a reasonable employee would consider adverse; and (3) a causal connection exists between his protected activity and the

---

[60] *See Thomas v. Berry Plastics Corp.*, --- F.3d ---, 20015 WL 5638027, at *2 n.4 (10th Cir. 2015) (applying same elements to Title VII and § 1981 retaliation claims)...Supra note 26.

adverse action.[61]  Defendants raise three challenges to Feasters' statutory discrimination-based retaliation claims.  First, Defendants again draw attention to the lack of any allegations that Defendants employ enough workers to qualify as an "employer" subject to liability under Title VII or KAAD.  Second, Defendants repeat their position that Feaster lacks standing to recover under § 1981, Title VII, and KAAD.  Third, Defendants argue that Feaster provides no allegations to establish the third prima facie element.

Concerning Defendants' first challenge, the Court agrees.  As stated above, Title VII and KAAD limit liability to employers who employ a sufficient minimum number of workers.[62]  The amended complaint is silent on the number of workers employed by Defendants during Feaster's employment.  Without these facts, the Court is unable to say that Feaster pleads a plausible claim for relief under Title VII and KAAD.  Accepting that Feaster can cure this technical defect, the Court grants Feaster leave to amend his pleadings and denies Defendants' motion to dismiss Feaster's Count III retaliation claims under Title VII and KAAD.

Section 1981, however, imposes liability irrespective of the size of an employer's workforce, leaving Defendants' remaining two arguments.[63]  According to Defendants, Feaster lacks prudential standing under § 1981 because he claims a derivative rather than direct injury.  Defendants reason that standing belongs only to the "direct victim of the alleged

---

[61] *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012).

[62] *See* 42 U.S.C. § 2000e(b) (defining "employer" under Title VII as one with 15 or more employees); K.S.A. § 44-1002(b) (defining "employer" under KAAD as one with 4 or more employees).

[63] *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975) ("Section 1981 is not coextensive in its coverage with Title VII.  The latter is made inapplicable to certain employers. 42 U.S.C. s 2000e(b) (1970 ed., Supp. III).").

discrimination."[64]   While Defendants' argument may undermine Feaster's hostile work environment claim, it works in favor of Feaster's retaliation claim.  Feaster claims a personal and direct injury—that Defendants terminated him for protesting Defendants' allegedly discriminatory conduct.  Section 1981 extends standing to white plaintiffs who bring retaliation claims based on opposing discrimination towards others.[65]   Therefore, even accepting Defendants' representation that Feaster is a Caucasian male who opposed discrimination directed at others based on characteristics that Feaster lacks, Feaster plausibly pleads standing to sue under § 1981 for retaliation.

So that leaves Defendants' final argument.  Defendants concede that Feaster pleads the first two elements of retaliation and focus only on the omission of details showing a causal connection.  Specifically, Defendants reason that the amended complaint relies on an erroneous syllogism: Feaster complained of something at some time to Defendants; at some later time, Defendants fired Feaster; therefore, Feaster's former conduct caused Defendants' subsequent conduct.  In Defendants' exact words, "It is inadequate to state that because [Feaster] complained of something at *some time*, any adverse action (no matter how much time has lapsed/at any other time) was the result of the former."   Temporal proximity between protected conduct and an adverse employment action, however, may demonstrate a causal connection.[66]   "[A] one and one-half month period between protected activity and adverse action may, by itself, establish

---

[64] *Diversified Educ. Training and Mfg. Co. v. City of Wichita*, 473 F. Supp. 2d 1140, 1152–53 (D. Kan. 2007).

[65] *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 452–53 (2008) (declaring that § 1981 prohibits retaliation against those, black or white, who oppose discrimination); *see also* Joseph C. Feldman, *Standing and Delivering on Title VII's Promises: White Employee's Ability to Sue Employers for Discrimination Against Nonwhites*, 25 N.Y.U. Rev. L. & Soc. Change 569, 602 n.90 (1999) (discussing cases representing the majority position that § 1981 provides standing to white plaintiffs suing for retaliation).

[66] *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

causation."[67]   Perhaps Defendants would be right that the amended complaint is inadequate,[68] except they overlook Feaster's Equal Employment Opportunity Commission charge filed with the amended complaint.[69]   That charge states that Feaster last complained to Dopps about Dopps' workplace behavior "approximately six weeks before [Feaster's] last day of work."  Feaster also alleges that Dopps, the person to whom Feaster complained, is the same person who terminated Feaster.  Given these allegations, Feaster adequately states a claim for retaliation under § 1981. The Court therefore denies Defendants' motion to dismiss Feaster's § 1981 retaliation claim.

### 3. Kansas Common-Law Retaliation

Finally, Feaster pursues recovery under Kansas common law for alleged retaliation against his whistleblowing activity.  Defendants insist that this claim must fail under the alternative remedies doctrine.  That doctrine precludes a state retaliation claim if a substitute state or federal statute provides an adequate remedy.[70]  Feaster bases this common-law claim on the same circumstances alleged to support his alternative theories of recovery for retaliation.  Yet he neither alleges nor argues that the common-law claim addresses a particular harm left unaddressed by the federal and state statutes discussed above.  To the extent Feaster pursues a Kansas common-law retaliation claim for disclosing FCA violations, the FCA provides an

---

[67] *Id.* (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

[68] *See Khalik*, 671 F.3d at 1193–94.

[69] "In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citations omitted).

[70] *Flenker v. Willamette Indus., Inc.*, 266 Kan. 198, 202–03, 967 P.2d 295, 299 (1998).

adequate remedy.[71]  To the alternative extent that Feaster claims retaliation under Kansas common law for opposing discriminatory conduct unlawful under § 1981, Title VII, and KAAD, those statutes provide adequate alternative remedies.[72]  Accordingly, the adequate remedies doctrine precludes Feaster's Kansas common-law retaliation claim.  The Court therefore grants Defendants' motion to dismiss this claim.

**D. Summary**

For the reasons stated above, the Court grants in part and denies in part Defendants' motion.  Specifically, the Court grants that motion as to Feaster's Count II hostile work environment claims and as to his Count III retaliation claim under the common law of Kansas. The Court denies that motion with respect to its requests for partial summary judgment and for dismissal of Feaster's sufficiently plead Count III retaliation claims under the FCA and § 1981. And because the Court cannot say with absolute certainty that amendment would be futile,[73] the Court grants Feaster leave to amend his Count I FCA claim and his Count III retaliation claims under Title VII and KAAD. Feaster has 14 days from the date of this Order to file a second amended complaint.

**IT IS THEREFORE ORDERED** that Defendants' Motion To Dismiss Amended Complaint And For Partial Summary Judgment (Doc. 16) is hereby **GRANTED IN PART AND DENIED IN PART.**  Feaster has 14 days from the date of this Order to file a second amended complaint.

---

[71] *Lipka v. Advantage Health Grp., Inc.*, 2013 WL 5304013, *7–8 (D. Kan. Sept. 20, 2013) ("the anti-retaliation provision of the FCA adequately protects [Kansas'] public policy and provides plaintiff with a sufficient remedy for the allegedly retaliatory discharge.").

[72] *Daniels v. United Parcel Serv., Inc.*, 797 F. Supp. 2d 1163, 1197–98 (D. Kan. 2011) ("Title VII [and] KAAD . . . provide an adequate remedy for plaintiff to pursue her retaliation claim").

[73] *See Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013).

**IT IS FURTHER ORDERED** that Feaster's Request For Oral Arguments On Defendants' Motion To Dismiss Amended Complaint And Motion For Partial Summary Judgment (Doc. 22) is hereby **DENIED.**

**IT IS SO ORDERED**.

Dated this 5th day of November, 2015.

*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE